**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SPIRIT OF THE SAGE COUNCIL, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 98-1873 (EGS) ) ) |
| DIRK KEMPTHORNE, Secretary of the Department of Interior, *et al.*, | ) ) ) ) |
| Defendants. | ) ) ) |

**<u>MEMORANDUM OPINION</u>**

Native American and environmental organizations and their members have brought this action challenging the validity of two federal rules under the Endangered Species Act ("ESA"), the No Surprises Rule and Permit Revocation Rule ("PRR", collectively "the Rules"), which were promulgated by the Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS", collectively "the Services").  In 2003 and 2004, the Court ruled that the PRR had been promulgated without providing adequate opportunity for public comment, remanded the Rules to the agencies, ordered the Services to complete the proceedings upon remand within one year, and enjoined use of the Rules in the interim.  The Services have now complied with the required procedures and repromulgated the PRR.  Pending before the Court

1

are the parties' cross-motions for summary judgment, which dispute both this Court's jurisdiction as well as the merits of plaintiffs' claims under the Administrative Procedures Act ("APA").  Upon consideration of the motions and supporting memoranda, the responses and replies thereto, the applicable law, the arguments made at the motions hearing on May 30, 2007, and the entire record, the Court determines that the it has jurisdiction and that the Rules are lawful under the APA. Therefore, for the reasons stated herein, plaintiffs' motion for summary judgment is **DENIED**, and defendants' motion for summary judgment is **GRANTED.**

## BACKGROUND

### A. Factual and Regulatory Background

The background of the parties and the statutory framework was discussed in detail in the Court's 2003 opinion, *Spirit of the Sage Council v. Norton*, 294 F. Supp. 2d 67, 73-80 (D.D.C. 2003) (hereinafter "Spirit I"), and need only be summarized here. Plaintiffs are a number of organizations who allege that their members regularly photograph, observe, study and otherwise enjoy endangered and threatened species and their habitats.  *Id.* at 73-74.  FWS and NMFS are agencies within the Department of the Interior and Department of Commerce respectively, which have been delegated the responsibilities under the ESA.  *Id.* at 75.  Two

additional parties, the Western Urban Water Coalition and a group of California local governments, have been granted leave to intervene as defendants. *Id.*

Section 9 the ESA, with certain statutory exceptions, makes it unlawful for any person to "take" a member of any species listed as endangered or threatened. *Id.* at 75-76.  In 1982, Congress amended the ESA to authorize the Services to permit otherwise prohibited takings of endangered or threatened species, if they are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *Id.* at 76 (quoting 16 U.S.C. § 1539(a)(1)(B)).  Incidental take permits ("ITP") are available to landowners and developers who agree to mitigate impacts to listed species through a Habitat Conservation Plan ("HCP"), which must satisfy both ESA statutory criteria and further requirements in the Services' regulations. *Id.*

Under Section 10 of the ESA, an applicant seeking an ITP authorizing it to "take" endangered or threatened species in the course of its activities on private land must prepare a HCP specifying, *inter alia*, the impact of the taking, measures to minimize the impact, and any other measures required by the Services.  16 U.S.C. § 1539(a)(2)(A).  In order to issue an ITP, the Services "must find that the taking will be incidental; the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; the applicant will ensure

that adequate funding for the plan will be provided; [and] the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  16 U.S.C. § 1539(a)(2)(B).

In 1994, the government announced the "No Surprises" policy, which required Services approving ITPs to provide landowners with "assurances" that once an ITP was approved, even if circumstances subsequently changed in such a way as to render the HCP inadequate to conserve listed species, the Services would not impose additional conservation and mitigation requirements that would increase costs or further restrict the use of natural resources beyond the original plan.  *Spirit I*, 294 F. Supp. 2d at 77.  Despite numerous objections, the Services promulgated a final No Surprises Rule, which essentially codified the No Surprises policy.  *Id.* at 78.  The new rule provides that "no additional land use restrictions or financial compensation will be required of the permit holder with respect to species covered by the permit, even if unforeseen circumstances arise after a permit is issued indicating that additional mitigation is needed for a given species covered by a permit."  *Id.* (quoting No Surprises Rule, 63 Fed. Reg. 8859, 8863 (Feb. 23, 1998), codified at 50 C.F.R. §§ 17.22, 17.32).  In the first decade following the enactment of Section 10 of the ESA, only 14 ITPs were issued, but between 1994 and 2002, 379 ITPs with No Surprises assurances have

4

been issued, covering approximately 30 million acres and
affecting more than 200 endangered or threatened species. *Id.* at
79.

While this Court was considering the original motions for
summary jugdment in this case, the FWS promulgated the Permit
Revocation Rule ("PRR"). *Id.* The PRR amends the regulations
specifically applicable to ITPs, which now include the No
Surprises Rule, and provides, in pertinent part, that an ITP "may
not be revoked . . . unless continuation of the permitted
activity would be inconsistent with the criterion set forth in 16
U.S.C. § 1539(a)(2)(B)(iv) and the inconsistency has not been
remedied [by the Services] in a timely fashion." *Id.* (quoting
Safe Harbor Agreements and Candidate Conservation Agreements With
Assurances, 64 Fed. Reg. 32,706, 32,712-14 (Jun. 17, 1999),
codified at 50 C.F.R. §§ 17.22(b), 17.32(b)). 16 U.S.C. §
1539(a)(2)(B)(iv) sets forth, as one of the conditions for
issuance of an ITP, that "the taking will not appreciably reduce
the likelihood of the survival and recovery of the species in the
wild." *Id.* at 79 n.2.[1] In effect, the PRR specifies that the
Services will not revoke an ITP unless continuation of the permit
puts a listed species in jeopardy of extinction. *See id.* at 86.

---

[1] The FWS also promulgated an additional rule that specified
that the general permit revocation regulations no longer applied to
ITPs. *Id.* at 79 n.3.

**B. Procedural History**

Before the Court in 2003 were plaintiffs' arguments that the No Surprises Rule and PRR violated the ESA and APA. *Id.* at 80. As an initial matter, the Court held that the plaintiffs had standing to bring their claims because the "plaintiffs' assertion of harm arising from the substantial and unprecedented increase in the number of ITPs sought and issued since the advent of the No Surprises Rule is sufficient to establish injury in fact." *Id.* at 82; *see also id.* at 82-83 (holding that plaintiffs met the causation and redressability prongs of the standing test based on that harm). The Court also concluded that plaintiffs' claims were ripe because they presented purely legal challenges to the Rules and there was no substantial reason to await further factual development of the issues. *Id.* at 83-85.

On the merits, the Court held that the PRR was promulgated in violation of the APA's procedural requirements. *Id.* at 85. Finding the PRR to be a substantive rule, the Court concluded that it was promulgated without the notice and comment required by the APA. *Id.* at 85-91. The Court thus did not need to reach plaintiffs' substantive challenges to the PRR, but vacated the PRR and remanded the rule for public notice and comment. *Id.* at 90-91. The Court further found that the No Surprises Rule was "sufficiently intertwined" with the PRR so that it also had to be remanded to the agency for reconsideration with the PRR without

further inquiry into its substantive validity.  *Id.* at 91.  The Court later issued an order requiring the Services to complete the proceedings on remand within one year, and to refrain from approving new ITPs containing "No Surprises" assurances pending completion of those proceedings.  Order (June 10, 2004).

The Services appealed the Court's final order, arguing that the interim suspension of the No Surprises Rule and the one-year deadline for repromulgation of the PRR exceeded the Court's authority under the APA.  *Spirit of the Sage Council v. Norton*, 411 F.3d 225, 226-27 (D.C. Cir. 2005) (hereinafter "Spirit II").  After the D.C. Circuit denied the Services' motion for a stay pending appeal, the FWS solicited public comment on both the PRR and its relationship to the No Surprises Rule, as ordered by the Court.  *Id.* at 228.  In December 2004, the FWS repromulgated the PRR without substantial change.  *Id.* (citing ESA ITP Revocation Regulations — Final Rule, 69 Fed. Reg. 71,723 (Dec. 10, 2004)).

The D.C. Circuit agreed with plaintiffs that the Services' appeal was moot because the Services fully complied with this Court's orders.  *Id.* at 227.  The Circuit thus did not address this Court's rulings that the plaintiffs had standing and that their claims were ripe for judicial review.  *Id.* at 230.  The court instead only dismissed the appeal as moot, vacated the orders that were appealed, and remanded the case for further proceedings before the Court.  *Id.*

7

On remand, plaintiffs and defendants have both filed motions for summary judgment.  Plaintiffs contend that the PRR and No Surprises Rule contravene the ESA and are arbitrary and capricious under the APA.  In their motion, defendants initially contend that plaintiffs lack standing and that their claims are not ripe for review.  On the merits, defendants argue that the PRR and No Surprises Rule are reasonable constructions of the ESA, and that the Services' explanations of the rules comply with the APA.  The intervenor-defendants have also filed a brief in support of the Services' arguments.

## STANDARD OF REVIEW

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific

8

facts showing that there is a genuine issue for trial.  Fed. R.
Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

## ANALYSIS

### I. Ripeness

Defendants argue that plaintiffs' claims are not ripe
because the legality of the Rules can only be determined in a
challenge to a specific permit decision, where a court can assess
whether an entire ITP complies with the ESA.[2]  Plaintiffs' first
response is that defendants' jurisdictional arguments should be
rejected following the Court's prior decision under the "law of
the case" doctrine.  Plaintiffs also contend that recent
precedent further demonstrates that the Court's conclusions on
jurisdiction were correct.

"The 'mandate rule,' an application of the 'law of the case'
doctrine, states that a district court is bound by the mandate of
a federal appellate court and generally may not reconsider issues
decided on a previous appeal."  *United States v. Ins. Co. of N.
Am.*, 131 F.3d 1037, 1041 (D.C. Cir. 1997).  Since the Court of
Appeals specifically did not address the questions of standing
and ripeness, *see Spirit II*, 411 F.3d at 230, the Court is not

---

[2]  The Services also briefly argue that the Rules do not
constitute final agency actions subject to review under the APA.
However, the Rules are clearly final agency actions since they mark
the consummation of the agencies' decision-making process and
determine rights or obligations for the Services and those applying
for ITPs.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

bound by the law of the case in this sense.  With regard to the
Court's own prior decisions in this case, the law of the case
doctrine leaves discretion for the Court to reconsider its
decisions prior to final judgment.  *Horn v. United States Dep't
of Army*, 284 F. Supp. 2d 1, 7 n.9 (D.D.C. 2003).  The doctrine
instructs, however, that "where litigants have once battled for
the court's decision, they should neither be required, nor
without good reason permitted, to battle for it again."  *Singh v.
George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).

"Ripeness requires [the Court] to evaluate (1) the fitness
of the issues for judicial decision and (2) the hardship to the
parties of withholding court consideration."  *Nat'l Park
Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808
(2003).  In considering fitness for review, claims that present
"purely legal" questions are presumptively reviewable.  *Nat'l
Min. Ass'n v. Fowler*, 324 F.3d 752, 756-57 (D.C. Cir. 2003).  As
in 2003, defendants rely on *National Park Hospitality* to argue
that challenges to agency regulations are not ripe until the
regulations have been applied concretely, and thus the Rules at
issue here must be reviewed in the context of a specific ITP.
The Court previously rejected this argument, distinguishing this
case because the Rules currently bind the Services and vest third
parties with regulatory rights.  *Spirit I*, 294 F. Supp. 2d at 85.
Were this defendants' only argument, the Court would reject it

again on the grounds that there is no "good reason" to upset the law of the case.  Defendants, however, have made additional arguments based on cases decided since 2003.

Defendants point to a recent decision from the Ninth Circuit, *Earth Island Institute v. Ruthenbeck*, 459 F.3d 954 (9th Cir. 2006).  At issue in that case were plaintiff's challenges to nine regulations that govern review of decisions implementing forest plans, on the grounds that the regulations were manifestly contrary to the governing statute.  *Id.* at 957-58.  The court held that because only one of the regulations had actually been applied to a proposed project, only that regulation was ripe for review.  *Id.* at 958.  The court essentially held that regulations could not be challenged until "its factual components [are] fleshed out, by some concrete action applying the regulation." *Id.* at 962 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990)).  While this principle would bar plaintiffs' claims in this case, it is not law of this circuit.

Contrary to the Ninth Circuit, the D.C. Circuit has held that "a purely legal claim in the context of a facial challenge . . . is presumptively reviewable." *Nat'l Ass'n of Home Builders v. U.S. Army Corp of Eng.*, 440 F.3d 459 464 (D.C. Cir 2006).  In that case, plaintiffs had facially challenged a regulation promulgated under the Clean Water Act.  *Id.* at 461.  The regulation governed when permits to discharge dredged or fill

material into navigable waters were required.  *Id.*  Contrary to the district court, the D.C. Circuit found that plaintiff's claims were ripe for review, even though they were not applied challenges to a project-specific agency decision.  *Id.* at 464.  "While the final determination of whether to require a permit in a given case will, as is usual in an agency adjudication, rest on case-specific findings, this fact does not diminish the fitness of [the regulation] for review."  *Id.*  Plaintiffs alleged that two features of the regulation exceeded the statutory authority to issue the regulation.  *Id.* at 463-64.  The court held that the "legality vel non of the two challenged features will not change from case to case or become clearer in a concrete setting."  *Id.* at 464.  In addition, the court noted that plaintiff's claim "rests not 'on the assumption that the agency will exercise its discretion unlawfully' in applying the regulation but on whether 'its faithful application would carry the agency beyond its statutory mandate.'"  *Id.* at 465 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998)).

In this case, plaintiffs claim that the PRR and No Surprises Rule facially contravene the ESA and that the Services have not articulated any rationale for the Rules consistent with the ESA. As in *Home Builders*, plaintiffs are facially challenging regulations that will govern fact-specific permitting decisions outside the context of a particular permit.  With these types of

claims, the "legality vel non of the" Rules "will not change from case to case of become clearer in a concrete setting." *See id.* at 464.  Plaintiffs are also alleging that faithful application of the rules would carry the Services beyond the ESA's boundaries, and not are relying on the agency's misuse of its discretion. *See id.* at 465.  Therefore, under *Home Builders*, plaintiffs' claims are ripe for review.

Another recent D.C. Circuit decision complicates this framework, but also supports this conclusion.  In *National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) (hereinafter "NTEU"), plaintiffs challenged regulations establishing a human resources management system for the Department of Homeland Security.  *Id.* at 843-44.  One set of rules allowed the agency to override collective bargaining agreements in certain areas and limit the scope of agreements. *Id.* at 846-48.  Defendants argued that facial challenges to these rules were not ripe because the agency may never exercise its discretion to override a collective bargaining agreement.  *Id.* at 854.  Nonetheless, the court found the challenges to be ripe because the mere threat of override damaged the collective bargaining process, and because the rules limiting the scope of agreements required no further action by the agency.  *Id.*  The court thus found the facial and purely legal challenges to be presumptively and actually reviewable.  *Id.* at 854-55.  Another

13

set of rules specified the role of the Merit Systems Protection Board ("MSPB") in reviewing appeals of certain employer actions. *Id.* at 850.  The court found that a facial and purely legal challenge to these rules was not ripe because review would be aided by case-specific facts and "[p]roblems with MSPB's review will arise only after DHS has disciplined an employee and the penalty has been appealed."  *Id.* at 855.

Plaintiffs' claims in this case are more closely akin to the claims against the collective bargaining provisions in *NTEU* than the claims against the MSPB provisions.  Like the former, the claims here attack regulations that have a direct and immediate effect on the Services and regulated third parties.  The PRR immediately prevents the Services from revoking an existing ITP in certain situations.  Thus, there would be no further action by the agency to challenge.  *See id.* at 854.  Unlike the MSPB rules in *NTEU*, which come into play only on appeal, plaintiffs here challenge rules that already have a direct effect on the Services — the PRR directly limits the Services' power to revoke existing permits and the No Surprises Rule directly constrains what types of ITPs the Services can further grant.  Therefore, any legal flaws in the Rules arise immediately.  *Cf. id.* at 855. Accordingly, the Court concludes that plaintiffs' claims are ripe for review.

## II. Standing

In order to have Article III standing, plaintiffs must demonstrate: "(1) 'injury in fact' that is 'concrete' and 'actual or imminent', not 'conjectural' or 'hypothetical;' (2) causation, 'a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant;' and (3) redressability, 'a likelihood that the requested relief will redress the alleged injury.'" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-04 (1998) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The Services argue that plaintiffs fail all three prongs of the standing test because plaintiffs' injuries are not attributable to the Rules, but to the subsequent issuance of ITPs or other discretionary agency actions.

This is essentially the same argument considered by the Court in its 2003 decision.  *See Spirit I*, 294 F. Supp. 2d at 82 (stating that defendants argue that plaintiffs must challenge a specific ITP and that harm to plaintiffs from No Surprises Rule is purely speculative).  The Court rejected this argument because "plaintiffs' assertion of harm arising from the substantial and unprecedented increase in the number of ITPs sought and issued since the advent of the No Surprises Rule is sufficient to establish injury-in-fact." *Id.*  The Court also concluded that the PRR is intertwined with the No Surprises Rule because the

conditions allowing for the revoking of ITPs has great bearing on whether the Services should authorize ITPs in the first place. *See id.* at 91.  In addition, the fact that an agency may still in its discretion choose not to revoke a permit if the Court strikes down the PRR does not defeat the redressability prong of standing.  *See FEC v. Akins*, 524 U.S. 11, 25 (1998).

Unlike their arguments on ripeness, defendants have not cited to any precedent decided since 2003, and do not point to any changed circumstances.  Therefore, since parties should not have to battle for the same judicial decision again without good reason, the Court will follow the law of the case, and holds that plaintiffs have standing to bring their claims.  *See Singh*, 383 F. Supp. 2d at 101.

## III. Whether the Rules are Contrary to the ESA

Plaintiffs' primary argument is that the PRR contravenes the ESA, and therefore is not "in accordance with law" under the APA. *See* 5 U.S.C. § 706(a)(2)(A).  In determining whether an action is "in accordance with law" within the meaning of that provision, the court must apply the familiar framework established by *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Under "step one" of *Chevron* analysis, the court must ascertain whether Congress had a specific intent on the issue before the Court.  *Natural Res. Def. Council v. EPA*, 194 F.3d 130, 135 (D.C. Cir. 1999).  In doing so, the Court must

16

consider "'the particular statutory language at issue, as well as the language and design of the statute as a whole.'" *Halverson v. Slater*, 129 F.3d 180, 184 (D.C. Cir. 1997) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).  Only if the Court determines that Congress "has not spoken to the question at issue, does *Chevron* step two" ordinarily "come into play, requiring the court to defer to the agency's reasonable interpretation of the statute." *South. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999).

The PRR significantly narrows the circumstances under which the Services may revoke ITPs.  The court previously analyzed the change effected by the PRR:

> Prior to promulgation of the PRR, the Services could revoke an ITP once "the population(s) of the wildlife or plant that is the subject of the permit declines to the extent that continuation of the permitted activity would be detrimental to maintenance *or* recovery of the affected *population*." *See* 50 C.F.R. § 13.28(a)(5) (emphasis added).  It appears beyond dispute that, following promulgation of the PRR, the Services can no longer revoke an ITP under these circumstances.  50 C.F.R. § 17.22 (An ITP "may not be revoked for any reason except those set forth in § 13.28(a)(1) through (4) or unless continuation of the permitted activity would be inconsistent with the criterion set forth in 16 U.S.C. 1539(a)(2)(B)(iv) and the inconsistency has not been remedied in a timely fashion.").  Instead, so long as "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild," the permittee commits no procedural violations, and the law does not change, the PRR precludes the Services from revoking an ITP.

*Spirit I*, 294 F. Supp. 2d at 86.  Plaintiffs focus on the difference that the original revocation standard refers to

maintenance and recovery in the disjunctive, whereas the PRR
requires a showing that both survival and recovery of a species
must be threatened before an ITP can be revoked.  *See id.*  Thus,
if activity under an ITP hinders the recovery of a species, but
not its survival, then the Services are foreclosed from revoking
the permit under the PRR.

Plaintiffs argue that the PRR is contrary to the ESA under
*Chevron* step one because the ESA as a whole and Section 10 in
particular require measures that insure the survival and recovery
of listed species.  Plaintiffs' argument is based on the
definition of "conservation" under the ESA.  The ESA defines
"conservation" as all methods that can be employed to "bring any
endangered species or threatened species to the point at which
the measures provided pursuant to this [Act] are no longer
necessary."  16 U.S.C. § 1532(3).  Conservation is thus "a much
broader concept than mere survival," and encompasses "recovery of
a threatened or endangered species."  *Sierra Club v. FWS*, 245
F.3d 434, 441-42 (5th Cir. 2001).  "Indeed, in a different
section of the ESA, the statute distinguishes between
'conservation' and 'survival.'"  *Id.* at 442 (citing 16 U.S.C. §
1533(f)(1)); *see Gifford Pinchot Task Force v. FWS*, 378 F.3d
1059, 1070 (9th Cir. 2004) ("By these definitions, it is clear
that Congress intended that conservation and survival be two
different (though complementary) goals of the ESA.").

18

Under ESA Section 10, parties seeking an ITP must submit a "habitat conservation plan" ("HCP") specifying the impact of the taking, measures to minimize the impact, and any other measures required by the Services.  16 U.S.C. § 1539(a)(2)(A).  Plaintiffs argue that because this document is called a "conservation" plan, ITP holders must necessarily be required to "conserve" species, *i.e.* use all measures to promote species' recovery.  *See* 16 U.S.C. § 1532(3).  It would follow then that ITPs should be revoked when the recovery of a species is imperiled.  In addition, plaintiffs contend that the overall purpose of the ESA is to "halt *and reverse the trend* towards species extinction, whatever the cost."  *TVA v. Hill*, 437 U.S. 153, 184 (1978) (emphasis added).  Thus, the issuance and revocation of ITPs arguably should utilize a recovery-based standard.

If ESA Section 10 did not further define the components of an HCP and requirements for granting an ITP, plaintiffs may have had a strong claim.  The more specific provisions of Section 10, however, fatally undermine plaintiffs' arguments.  Section 10 requires that an ITP applicant's conservation plan must specify, *inter alia*, "the impact which will likely result from such taking" and "what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps."  16 U.S.C. § 1539(a)(2)(A)(i), (ii).

These requirements speak to minimizing impact upon species, but do not address at all the recovery of species.

Section 10 also includes specific findings that the Services must make in order to grant an ITP:

> (i) the taking will be incidental;
> (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
> (iii) the applicant will ensure that adequate funding for the plan will be provided;
> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.

16 U.S.C. § 1539(a)(2)(B).  These statutory criteria directly undercut plaintiffs' arguments that ITPs must promote the recovery of listed species.  To the contrary, applicants are only required to minimize and mitigate the impact on species "to the maximum extent possible."  *Id.*[3] More importantly, applicants are only required not to reduce "the likelihood of the survival *and* recovery of the species."  *Id.* (emphasis added).  Therefore, ITPs may be granted if the likelihood of recovery, but not survival, is appreciably reduced.  *See* 50 C.F.R. § 402.02 (defining an act to "jeopardize the continued existence of" a species if it "reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery" of the species).

---

[3]  "The words 'maximum extent possible' signify that the applicant may do something less than fully minimize and mitigate the impacts of the take where to do more would not be practicable."  *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 928 (E.D. Cal. 2004).

Thus, while applicants must submit a "conservation" plan, the statutory text makes clear that ITPs can be granted even if doing so threatens the recovery of a listed species.  To the extent that there is a conflict between the general definition of "conservation" and the specific criteria in 16 U.S.C. § 1539(a)(2)(B), the "specific statutory language should control more general language when there is a conflict between the two." *Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002).[4]

Finally, Section 10 contains a specific provision regarding the revocation of permits.  "The Secretary shall revoke a permit issued under this paragraph if he finds that the permittee is not complying with the terms and conditions of the permit."  16 U.S.C. § 1539(a)(2)(C).  This provision mandates revocation for failing to abide by an ITP's conditions, but does not require revocation due to a threat to a species' recovery.  Therefore,

---

[4] One district court has reached the opposite conclusion, but did so without closely scrutinizing the statutory text of ESA Section 10.  *Sw. Ctr. For Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1129 (S.D. Cal. 2006) (An ITP "permit application must satisfy the ESA goal of conservation, which will allow the species to recover in order to reverse the trend to extinction." (internal quotation marks omitted)).  Another district court also summarily reached the opposition conclusion, in dicta, without analysis.  *Sierra Club v. Babbitt*, 15 F. Supp.2d, 1274, 1278 n.3 (S.D. Ala. 1998) ("Pursuant to section 10, the FWS may issue a permit for the 'incidental take' of some members of the species, if the applicant for the permit submits a 'conservation plan' that will – as its name plainly connotes – help 'conserve' the entire species by facilitating its survival and recovery.").  Given the lack of statutory analysis, neither opinion is persuasive.

when ESA section 10 is analyzed closely, it becomes clear that the specific provisions of the ESA do not require ITPs to promote or even maintain the recovery of listed species.  Thus, the PRR does not fail under *Chevron* step one.

Plaintiffs nonetheless argue that a recovery-based standard must be applied to ITPs following a recent Ninth Circuit decision, *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004).  That case, however, concerned an entirely different section of the ESA.  At issue was the FWS's interpretation of "destruction or adverse modification" of a designated "critical habitat" of a listed species in 16 U.S.C. § 1536(a)(2).  *Id.* at 1069.  The court found the FWS regulation in question to be invalid under *Chevron* step one because it protected only the survival of listed species, but not their recovery.  *See id.* at 1069-70.  The court based its conclusion on the definition of "critical habitat," which includes areas "essential to the conservation of the species."  *Id.* at 1070 (citing 16 U.S.C. § 1532(5)(A)).  The same logic cannot be applied to ITPs.  While the recovery-based definition of conservation was central to defining critical habitats, the same cannot be said for ITPs.  Instead, as described above, the specific statutory provisions in ESA Section 10 demonstrate the Congress did not intend ITPs to have to promote or maintain the recovery of listed species.

Accordingly, the Court rejects plaintiffs' argument that the PRR is invalid under *Chevron* step one.

At *Chevron* step two, when "the statute is silent or ambiguous with respect to the specific issue, the question . . . is whether the agency's answer is based on a permissible construction of the statute." *Ranbaxy Laboratories Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006) (quoting *Chevron*, 467 U.S. at 843). Plaintiffs argue that the PRR is invalid under *Chevron* step two because it contradicts the ESA's general purpose of protecting the recovery of listed species. For the reasons already discussed, however, the statutory text of ESA section 10 demonstrates Congressional intent to allow the Services to grant ITPs even if they do not protect the recovery of listed species.

Moreover, the PRR adopts a facially reasonable policy for revocation. Under the PRR, ITPs may be revoked if continuation of the permitted activity would be inconsistent with the statutory criteria for issuing the permit initially, and the inconsistency has not been remedied by the Services in a timely fashion. *See* 50 C.F.R. §§ 17.22(b), 17.32(b). Because the ESA only sets forth specific criteria for the issuance of ITPs, it is a perfectly logical policy to trigger revocation of ITPs when those criteria can no longer be met. Accordingly, the Court concludes that the PRR is a permissible and reasonable construction of the ESA. *See Chevron*, 467 U.S at 843.

Plaintiffs contend that the No Surprises Rule is also contrary to the law, especially in light of its close relation to the PRR.  Specifically, they argue that it is contrary to law "for the Services to extend unprecedented regulatory assurances to all ITP holders without even requiring that their ITPs/HCPs be compatible with species recovery and, indeed, even where the ITPs/HCPs may be detrimental to such recovery."  Thus, plaintiffs' argument is that the No Surprises Rule is contrary to the ESA because it makes more permanent conditions in an ITP that may not promote or maintain the recovery of listed species.  As discussed, the ESA does not require ITPs to promote or maintain the recovery of species.  Therefore, the Court concludes that the No Surprises Rule is not contrary to the ESA.

## IV. Whether the Rules are Arbitrary and Capricious

Plaintiffs argue that the Rules are arbitrary and capricious because the Services have failed to articulate a reasoned basis for the rules.  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action." *AT&T Corp. v. FCC*, 236 F.3d 729, 734 (D.C. Cir. 2001) (quoting *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("State Farm")). In addition, "when an agency determines to change an existing

regulatory regime it must do so on the basis of 'reasoned analysis.'"  *Id.* at 735 (quoting *State Farm*, 463 U.S. at 42).

Plaintiffs have challenged several alleged defects in the Services' justifications for the new Rules.  Each will be considered in turn.  First, plaintiffs argue that the Services have failed to explain how allowing ITPs that impede recovery of listed species, under the PRR, is consistent with the ESA.  The Services, however, have clearly explained that they believe that matching the ITP revocation criteria to the statutory ITP issuance criteria more accurately reflected Congressional intent.  ITP Revocation Regulations — Final Rule, 69 Fed. Reg. at 71727.  As discussed in Section III, *supra*, this was a reasonable policy choice given the underlying statutory provisions.

Second, plaintiffs argue that the Services have failed to explain why the PRR's standard for revocation of ITPs is drafted in discretionary rather than mandatory terms.  The Services, however, explained that permit revocation decisions are always fact-intensive and require the exercise of agency discretion, so it is more appropriate to describe permit revocation standards in discretionary rather than mandatory terms.  *Id.* at 71728.  The statutory revocation standard, 16 U.S.C. § 1539(a)(2)(C), implies that agencies have discretion in revoking permits because some discretionary investigation is necessary before the agencies can "find" that permit-holders are not complying with the terms of

25

the ITP.  *See Envtl. Prot. Info. Ctr. v. FWS*, No. 04-4647, 2005
WL 3021939, at *9-10 (N.D. Cal. 2005) (holding that agencies have
discretion in investigating and revoking ITPs).  Therefore, it is
rational for the Services to phrase the PRR in discretionary
terms.

Third, plaintiffs argue that the Services have failed to
explain why the PRR's standard for revocation is triggered by
jeopardy to a species, but not impairment of a species' critical
habitat.  Again, the Services rationally explained that since the
statutory ITP issuance criteria only refer to jeopardy of a
species, that same standard should be used for the revocation of
ITPs.  *See* ITP Revocation Regulations — Final Rule, 69 Fed. Reg.
at 71728; Section III, *supra*.

Fourth, plaintiffs argue that the Services' justification
for the No Surprises Rule – that it was necessary to create
greater incentives for landowners to engage in conservation under
ESA Section 10 – is inconsistent with the ESA.  The ITP framework
is an alternative to regulation through the enforcement against
illegal "takings" of listed species under ESA Section 9.  *See*
Daniel J. Rohlf, *Jeopardy Under the Endangered Species Act:
Playing a Game*, 41 Washburn L. J. 114, 123-25 (Fall 2001).  While
strict in theory, enforcement-based regulation may be flawed
because illegal take prosecutions are difficult, expensive, and
therefore rare.  *See id.* at 123 ("in a five year period from 1988

to 1993, the General Accounting Office identified only eight successful prosecutions nationwide against habitat destruction that resulted in take of protected species"). Thus, Section 10 permitting creates an alternate, private/public method of habitat conservation. *See id.* at 124  In order to encourage the use of ITPs, Congress directed the Services to provide "adequate assurances . . . to the financial and development communities that a section 10(a) permit can be made available for the life of the project." H.R. Conf. Rep. No. 97-835 at 30-31, 1982 U.S.C.C.A.N. 2871-72.  Thus, it is rational for the Services to follow Congressional intent, and create incentives for private landowners to apply for and utilize ITPs.

Fifth, plaintiffs argue that the Services have failed to explain why the No Surprises Rule grants assurances that ITP conditions will not be modified even though ITPs can still be revoked under the PRR.  The Services explained, however, that revoking an ITP is a "last resort," and thus that the PRR only slightly reduces the permittees' interest in a secure ITP, and does not significantly impair the desired incentive to provide landowners who assist listed species with cost certainty.  *See* ITP Revocation Regulations — Final Rule, 69 Fed. Reg. at 71,729-30.

Sixth, plaintiffs argue that the Services have failed to explain how the No Surprises Rule is tenable given the

government's duty under the ESA to insure that any government action "is not likely to jeopardize the continued existence" of a listed species.  As the Services concede, the issuance of an ITP constitutes a federal action that must be reviewed in an intra-agency consultation under ESA Section 7.  *Spirit I*, 294 F. Supp. 2d at 76.  Therefore, before issuing an ITP, the Services must find that doing so "is not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1532(a)(2); *see Sw. Ctr. For Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1129 (S.D. Cal. 2006).  Depending on the conditions imposed by the ITP, it is certainly possible that issuing an ITP with No Surprises assurances may satisfy the no-jeopardy standard.  Since this is a facial challenge, and the No Surprises Rule is not logically inconsistent with the no-jeopardy standard, it is appropriate for the Court to presume that the Services will faithfully execute their duties under Section 7 and reasonably determine whether an ITP complies with the no-jeopardy standard at the time of issuance.

Finally, plaintiffs argue that the Services have failed to explain why the No Surprises Rule does not require an ITP holder to address foreseeable changed circumstances if those circumstances were not addressed at the time of the ITP's issuance.  Plaintiffs argue that this policy gives ITP applicants

28

an incentive not to discuss foreseeable changed circumstances
when they apply for an ITP.  The Services have explained,
however, that "[a]ll reasonably foreseeable circumstances,
including natural catastrophes that normally occur in the area,
should be addressed in the HCP."  No Surprises Rule, 63 Fed. Reg.
8859, 8863 (Feb. 23, 1998).  If ITP applicants fail to address
foreseeable circumstances, the Services can deny the ITP
application.  Therefore, the Services can handle plaintiffs'
concern under the Rules.  Finding none of plaintiffs' arguments
persuasive, the Court concludes that the Rules are not arbitrary
and capricious under the APA.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary
judgment is **DENIED**, and defendants' motion for summary judgment
is **GRANTED**.  An appropriate Order accompanies this Memorandum
Opinion.


**Signed:**     **Emmet G. Sullivan**
            **United States District Judge**
            **August 30, 2007**